JACKIE R. STOKES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Stokes v. Commissioner
Docket Nos. 10728-78, 10729-78, 10730-78, 10731-78, 10732-78, 10733-78, 10734-78.
United States Tax Court
T.C. Memo 1983-229; 1983 Tax Ct. Memo LEXIS 559; 45 T.C.M. (CCH) 1415; T.C.M. (RIA) 83229; April 26, 1983. Robert J. Mauceri and Jonathan Katz, for the petitioners. Robert Percy, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent asserted transferee liability in these consolidated cases against petitioners, as transferees of The Techni-Chem Company (Techni-Chem), for an income tax deficiency of $176,472.52 determined to be due from Techni-Chem for the taxable year ended September 30, 1976. After concessions by the parties the sole question remaining for the Court's determination is whether Techni-Chem's shipment of a large quantity of its product to a regular customer was in the ordinary course of business *560 or was a sale of substantially all of its inventory in a single transaction that qualifies for nonrecognition treatment under section 337(b)(2). [2]
FINDINGS OF FACT Some of the facts have been stipulated, and are found accordingly. The stipulation is incorporated herein by reference. Petitioners in this case are Jackie R. Stokes and six trusts established by Mr. Stokes. Petitioners are the transferees of The Techni-Chem Company ("Techni-Chem" or the "corporation"), a Connecticut corporation. Mr. Stokes (hereinafter "petitioner") was the president of Techni-Chem during the period here in issue. Petitioner owned 20 percent of the outstanding shares of Techni-Chem at all relevant times, and the various trusts owned the remaining outstanding shares. Techni-Chem timely filed its corporate income tax return for the fiscal year ending September 30, 1976, with the Internal Revenue Service Center in Andover, Massachusetts. Techni-Chem was the sole domestic manufacturer of guaiacol, an organic chemical that is primarily used *561 for the further manufacture of products in the pharmaceutical industry. Although Techni-Chem had approximately 20 customers, one company, S.B. Penick and Company ("Penick"), bought most of Techni-Chem's production, accounting for 85 percent of total sales. Penick also purchased small amounts of guaiacol from foreign manufacturers. A contract for the period January 1, 1973, through December 31, 1975, obligated Penick to purchase no less than 400,000 pounds and no more than 600,000 pounds of guaiacol from Techni-Chem at a price set initially in the contract but adjustable quarterly. Penick's annual purchase from Techni-Chem during that period was approximately 550,000 pounds. The price of guaiacol under the contract just prior to the expiration of the contract was $3.00 per pound. During the second half of 1975, Techni-Chem and Penick began negotiating a new arrangement. Penick wanted to reduce its dependence upon Techni-Chem and cut purchases by 50 percent, while establishing another supplier. Techni-Chem could not have continued without the major portion of Penick's business and began considering the sale of the assets to various companies, including Penick, and the manufacture *562 of new chemicals. On December 22, 1975, Penick ordered its remaining allotment under the contract, 140,000 pounds, to ensure an adequate supply through the winter in case a new arrangement was not made. (This purchase was sent in separate shipments on December 22, 1975, and January 2, 5, and 9, 1976.) After that sale, Techni-Chem reduced the price from $3.00 per pound to $2.60 per pound to induce Penick to sign an agreement. In mid-December, Peter Trippett, a vice-president of Penick, held discussions with petitioner concerning Penick's acquisition of Techni-Chem. In early January 1976, Penick began a formal examination of Techni-Chem to determine whether Penick should actually buy the assets of the corporation. By late January, Penick's board had made a preliminary decision to recommend the acquisition but sent an engineer to Techni-Chem to prepare a final report. The engineer's report of February 10, 1976, confirmed Trippett's determination that the purchase of Techni-Chem would be worthwhile for Penick, and Penick's board presented its recommendation to the board of its parent, CPC International, for the final decision. On February 18, 1976, Trippett and other officers of *563 Penick told petitioner the sale seemed likely but that Penick would like to acquire some guaiacol for testing purposes to determine whether the new batch had been improved as previously requested by Penick. Petitioner was reluctant to provide Penick with any product before an agreement was reached because withholding guaiacol was his only leverage to push Penick into an agreement, but he finally agreed to ship 30,000 pounds on consignment for testing purposes only, with the understanding that Techni-Chem owned the product and could recall it if the sale of the corporation's assets did not go forward. Although consignment sales are not unusual in the chemical industry, Techni-Chem and Penick had not previously engaged in such transactions. (The customary practice was for Penick to prepare an order form and then Techni-Chem would prepare a bill of lading and an invoice to accompany the shipment. Penick would test the product, which was usually a 7-day procedure, and then pay for the chemical within 30 days.) Pursuant to the agreement between petitioner and Trippett, petitioner instructed Florence Blaski, the secretary and treasurer of Techni-Chem, to send 30,000 pounds of the chemical *564 to Penick. A secretary in the office prepared documentation, which included an invoice requesting payment in the usual manner, net cash in 30 days. When petitioner learned of the invoice he told Ms. Blaski to void it because the shipment was on consignment. She voided the invoice, filed one copy, and destroyed the rest. The order form sent by Penick reflected that the order was on consignment. The guaiacol was shipped on February 24, 1976, and Penick was notified to disregard any invoice that may have been sent. Techni-Chem continued to sell small amounts of guaiacol to others in the ordinary course of business, utilizing the invoice procedure customary with Penick. On April 5, 1976, Techni-Chem and Penick entered an agreement for the sale of the assets of Techni-Chem to Penick. Included was all realty, office fixtures, and equipment owned by Techni-Chem (except for one car), as well as patents, inventory, and work in process. The schedule of assets provided that 198,870 pounds of guaiacol, which was Techni-Chem's entire finished inventory and included the 30,000 pounds already in Penick's possession, would be transferred pursuant to the sales agreement, providing it passed *565 the assay tests conducted by Penick. The price for the guaiacol, as separately stated in the schedule, was $517,062, or $2.60 per pound. Guaiacol that was still in production when the sales agreement was signed, 11,094 pounds, was separately provided for in the contract and was sold at a price of $1.70 per pound. The 168,870 pounds of finished inventory still held by Techni-Chem was shipped to Penick between April 6, 1976, and April 9, 1976. It passed the assay tests conducted by Penick and was paid for on April 19, 1976, at the time of closing on the April 5, 1976, agreement. A plan of liquidation was adopted by Techni-Chem on April 19, 1976, and the corporation was dissolved as of May 12, 1976. All of its assets were distributed to the shareholders within 12 months of liquidation. The gain from the sale of the assets was not reported on Techni-Chem's corporate income tax return for the fiscal year 1976. Notices of deficiency dated August 16, 1978, that included in taxable income profit from the sale of the 198,870 pounds of guaiacol were issued by respondent to the transferees of Techni-Chem. The gain from the sale of Techni-Chem's other assets was accorded nonrecognition *566 treatment by respondent in his recalculation. Other audit adjustments were settled by the parties prior to trial. ULTIMATE FINDINGS OF FACT The sale of 209,964 pounds of quaiacol by Techni-Chem pursuant to the April 19, 1976, contract was a sale of inventory to one person in one transaction within the meaning of section 337(b)(2). OPINION Section 337, in general, provides for the nonrecognition of gain or loss realized by a corporation from the sale of its property within the 12 months following the adoption of a plan of liquidation. Gain or loss resulting from the sale of stock in trade (inventory) is among the items excluded from nonrecognition treatment, however, unless substantially all of it is sold to one person in one transaction. Section 337(b)(2). To help determine whether this requirement has been met, section 1.337-2(a), Income Tax Regs., provides: The date on which a sale occurs depends primarily upon the intent of the parties to be gathered from the terms of the contract and the surrounding circumstances. * * * Moreover, an executory contract to sell is to be distinguished from a contract of sale. Ordinarily, a sale has not occurred when a contract to *567 sell has been entered into but title and possession of the property have not been transferred and the obligation of the seller to sell or the buyer to buy is conditional. Thus, "[t]he question as to when a sale is consummated for tax purposes is a practical one, which must be decided by weighing all of the various factors present in each case." Harmston v. Commissioner,61 T.C. 216, 228 (1973), affd. 528 F.2d 55 (9th Cir. 1976). We conclude on the facts of this case that both Techni-Chem and Penick regarded the guaiacol shipped in February as belonging to Techni-Chem unless the parties finalized a sale of Techni-Chem's assets and the chemical passed Penick's quality tests. Petitioner could recall the product at any time, and the use of the term "consignment" indicated an intention by both parties to delay the passage of title. Petitioner's testimony that he would not sell guaiacol to Penick without the benefit of an economically favorable contract was corroborated by Mr. Trippett. Respondent asserts that petitioner's testimony is not believable but has not shown it to be false in any way. Respondent attaches great significance to the fact that *568 Penick prepared an order form for the consignment order with the "normal retail" price on it and that Techni-Chem prepared a corresponding invoice, also with the "normal retail" price on it, but we do not find such facts persuasive. Petitioner testified that by the time of the shipment $2.60 per pound "had basically been agreed to as the price at which the inventory would have been sold and transferred to Penick." Petitioner agreed to ship the chemical because the parties were nearing an agreement and Penick needed to determine whether the quality of Techni-Chem's product had been improved, as previously requested. Techni-Chem made no attempt to collect payment for the chemical although the customary practice was for payment within 30 days. [3] The foregoing evidence shows that the transfer of ownership was contingent upon a future event, i.e., agreement for sale of all of the assets of Techni-Chem to Penick. *569 Respondent points out that the final batch of guaiacol, produced between April 5, and April 19, 1976, was sold at a price substantially lower than the 198,870 pounds and claims that fact proves the contracting parties in reality entered separate sales transactions with respect to the guaiacol. The sales agreement for the sale of Techni-Chem's assets, however, acknowledges that some product would still be in process on April 5, when the parties signed the agreement. The parties had agreed that Penick could test the guaiacol and reject any not meeting Penick's standard. Only the finished product was available for testing prior to closing. It is therefore reasonable for a lower price to have been assigned to the small amount of guaiacol produced between signing and closing, and petitioner has adequately explained the difference in price. Pricing a product at different stages of production differently does not mean that separate sales occurred. Penick acquired ownership rights to all of the guaiacol in question at the same time. Until April 19, 1976, Penick could refuse any and all of the guaiacol. "Conditions which excuse a buyer from performance or delay the duty to pay or *570 to accept title are relevant in eetermining whether a sale or exchange has been completed under section 337." Bear v. Commissioner,650 F.2d 1167, 1169 (10th Cir. 1981), affg. a Memorandum Opinion of this Court. We conclude that Techni-Chem sold its entire inventory, 209,964 pounds, of guaiacol in one sale to one person on April 19, 1976. The sale therefore qualifies for nonrecognition of gain treatment. Because of concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Alan D. Stokes Spray Trust, Robert J. Mauceri and Shirley G. Stokes, Trustees, docket No. 10729-78; Stephen W. Stokes Spray Trust, Robert J. Mauceri and Shirley G. Stokes, Trustees, docket No. 10730-78; Jeffrey R. Stokes Spray Trust, Robert J. Mauceri and Shirley G. Stokes, Trustees, docket No. 10731-78; Jeffrey R. Stokes Accumulation Trust, Robert J. Mauceri and Shirley G. Stokes, Trustees, docket No. 10732-78; Alan D. Stokes Accumulation Trust, Robert J. Mauceri and Shirley G. Stokes, Trustees, docket No. 10733-78; Stephen W. Stokes Accumulation Trust, Robert J. Mauceri and Shirley G. Stokes, Trustees, docket No. 10734-78.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
3. Respondent claims that Penick utilized some of the February shipment on March 23, 1976, but the evidence in the record does not establish that, and, in any event, an unauthorized premature use of the guaiacol would not change the consignment shipment into a final sale.↩